## FORREST a. FORREST.

*New York Superior Court, Special Term, June, 1859.*

*Again, General Term, July, 1859.*

LACHES.—NEW YORK SUPERIOR COURT.—ALIMONY.—COMMISSION
TO TAKE TESTIMONY.*

On affirming a judgment granting a divorce to the plaintiff, the wife, the court directed a reference, to ascertain the amount of alimony. About three years afterwards the plaintiff, for the first time, noticed the reference for hearing, whereupon the defendant moved for a commission to take testimony in a distant State.

*Held*, that the motion was too late; it might have been made long before, and the defendant might have himself brought on the reference. The delay of the plaintiff to do so did not excuse defendant's neglect to move earlier.

*It seems*, that in an action, the subject-matter of which was prior to the Code, cognizable alone in a court of equity, *e. g.*, an action for divorce, the New York Superior Court have the same power as the late Court of Chancery.

When a woman is divorced from her husband, by reason of his adultery, her right to such suitable allowance as may be just, having regard to the circumstances of the parties respectively, as they exist at the time the decree is pronounced, is perfect and absolute.

It is no part of the province of the court that fixes the amount to watch over her subsequent conduct in life, or to take proof of it, as a ground of affecting the right to an allowance, or its amount.

* DESHAY a. PERSSE (*New York Common Pleas, Special Term, September*, 1859).—In this cause a motion was made on behalf of the defendant, for a commission to examine witnesses in Ireland and in the State of California.

*Galbraith & Townsend* for the motion.

*Charles S. Spencer*, opposed, objected that the affidavit on which the motion was founded, was defective in being made by counsel, and on information and belief, instead of being made by the party, and without explaining why it was not made by him and stating where he was.

The defendant's counsel then stated that the defendant was absent in Europe.

DALY, J., *held*, that the absence of defendant being conceded, and there being no other objection, the motion should be granted, issuing the commission, with a stay of proceedings for three months.

The wife's subsequent misconduct no more impairs her right to it than such subsequent misconduct would impair her right to dower or to a distributive share of her husband's personal estate, if he had died intestate, and no divorce had been pronounced.

Whatever may be the power of the court, under particular statutes, or in the absence of any statute affecting the question, to enlarge or diminish the amount, subsequently, by reason of an improvement or loss of the faculties (the property) of either or of both of them, the allowance is to be fixed in view of all the circumstances proper to be considered, as they exist at the time the decree is pronounced. How she spends it does not concern the former husband or the court.

Her subsequent ill-conduct cannot be punished by a forfeiture of part of an allowance, just in itself, when fixed and adjudged to her by reason of her husband's violation of his legal duties to her.

Of the principles on which the amount of alimony should be determined.

Application for a commission to take testimony denied, on the ground, among others, that it asked to examine witnesses who were not named.

Motion for a commission to take testimony, and appeal from an order denying the same.

This action was by wife against husband, for a divorce. The divorce having been granted, the defendant, on his own petition, with certain affidavits annexed, and upon the pleadings and proceedings theretofore had in the case, now moved for a commission to take testimony in California, to be used on a reference pending before Alvin C. Bradley, Esq., to determine the amount of alimony. The motion was denied by WOODRUFF, J., at special term; and, on appeal, the general term affirmed the denial.

The course of the controversy was very fully developed in the papers laid before the court. The facts immediately pertinent to the motion will be here stated. (See also 3 *Ante*, 144; 10 *Barb.*, 46.)

The defendant recriminated, charging adultery with six persons named in his answer. The cause was tried before the late Chief-justice Oakley. It occupied about six weeks, terminating January 26, 1852, when the jury found a verdict that the plaintiff had not committed any of the offences charged; that the defendant was guilty of adultery, and that he ought to pay $3000 per annum, as alimony. The defendant did not, by any motion or appeal, impeach the verdict as being contrary to the evidence, or object to the charge of the judge. He took exceptions to the admission of certain evidence for the plaintiff, and

Forrest *a.* Forrest.

to the rejection of certain evidence offered by himself. He also excepted to the méthod in which the alimony was settled, claiming that the jury had not cognizance of it, and that it should have been fixed by the judge, after a preliminary reference to ascertain the facts. Judgment was accordingly entered at the special term, January 31, 1852, against the defendant, for a divorce, and for the alimony found by the jury. The defendant appealed to the general term, and stayed execution for the alimony by giving security.

The appeal was heard at general term, and on July 24, 1856, the judgment for divorce was affirmed. But the court held that the alimony should be settled by a reference, which was ordered accordingly. (See the decision reported, 3 *Ante*, 144.)

I. *June*, 1859. Motion for a commission. The defendant moved at special term for a commission to take testimony to be used upon the reference. The petition on which the application was made, stated the proceedings, and stated that since July 24, 1856, when the order of reference was entered, no step had been taken by the plaintiff to execute it until May 26, 1859, on which day notice was given of a hearing before the referee on the 9th of June following; that the plaintiff, shortly after the special term judgment, went to California, where she passed some two years, or the larger portion thereof, in the profession of an actress and theatrical manager, at San Francisco, and occasionally at Sacramento city, Nevada, and other cities; thence she visited Australia and Great Britain in the same capacity, and some time last autumn returned to this city, where she remained for some weeks, and then commenced a professional tour through the United States, and was last heard of by the petitioner at Dubuque, in the State of Iowa. That during the two years or so that she resided in San Francisco, she gradually fell from the favorable position first accorded to her, and acquired the reputation of being a woman of bad morals and dissolute and extravagant life, addicted to the excessive use of ardent spirits, and also unchaste, not with reference to one person alone, but to several. The petition then continued as follows:

In the course of a year or so after her arrival in San Francisco, these rumors reached your petitioner, at first obscurely, and afterwards more definitely; and coupling these reports

with a total cessation of all proceedings, on her part, in this cause, and her frequent declarations, reported to him, that she scorned to take, and would not accept, alimony from him, your petitioner was led to form and did form the belief that she had probably abandoned further prosecution of the suit; hence, he did not feel called upon to incur the expense, and subject himself to the mortification, of searching out accurately the exact foundation of each report that reached him, or taking testimony in regard thereto; but as he became gradually more convinced that she had fallen lower and lower in vice and depravity, and persuaded that she had abandoned the further prosecution of this suit, he rather studied to avoid hearing of her profligacies, than to inform himself of the particulars, until quite recently, when on hearing, indirectly, after plaintiff's return to this city, that it was her intention to proceed in this reference, your petitioner caused diligent inquiry to be made to ascertain what had been the character and conduct of the said plaintiff since the entry of said judgment of divorce, in January, 1852. That your petitioner, in prosecuting these inquiries, has received such information as leaves no doubt on his mind, that said plaintiff, since the entry of said judgment, has led a life of extravagance, intemperance, immorality, and vice. That he has derived information of acts of intemperance, immorality, fornication, and adultery, on the part of said plaintiff, during the period referred to, from statements made by witnesses thereof, in some instances, and from careful inquiry as to facts which were within the knowledge of other witnesses, and could and would be testified to, if the testimony was required or compelled.

That for the purpose of establishing these facts, it will be necessary to examine a large number of witnesses in the State of California. That the facts which your petitioner expects and believes he shall be able to prove, and to which he has heretofore referred, necessarily involve to some extent the conduct and morality of the witnesses who will be required to testify thereto, and your petitioner has reason to believe, and does believe, that every effort will be made by the witnesses to avoid giving testimony by evading the interrogatories that might be framed or propounded to them, or by giving such answers as, while strictly true, would yet suggest an interrogatory that would extract the truth, and by other subterfuges and devices. That informa-

tion has been wilfully withheld from him, and from those who sought it in his behalf, while prosecuting these inquiries, by persons who were known to possess, and who admitted, a knowledge of facts material and relevant to the defence of this case. That if written interrogatories should be framed to propound to the witnesses, it is impossible to foresee to what extent the answers to these interrogatories might suggest further questions, indispensable to a full examination of the witness, but it is obvious that this would be true to a great extent.

That among the witnesses hereinafter-named are several who, your petitioner is informed and believes, have had criminal intercourse with the said plaintiff, and who must therefore be treated and examined as adversary witnesses; that several of the others are knowing to facts, as your petitioner is informed and believes, tending to convict the plaintiff of immorality, fornication, and adultery, to which they will be reluctant to testify; that it has been impossible for your petitioner to obtain that precise knowledge of the circumstances, of dates, places, parties present, and other details, which would be indispensably requisite in framing interrogatories to elicit these facts; and yet he is informed, and has no doubt, on an oral examination they could be easily proved; that several of the witnesses hereinafter named are acquainted with the same facts, and the testimony of any one of them, if voluntary and truthful, might dispense with the necessity of examining several of the others, as to the same facts; that your petitioner is informed and believes, that there are many other witnesses who are conversant with many of the facts which the defendant proposes to prove on the said reference, and several of whom it may become indispensable to examine, in case the witnesses hereinafter named evade or refuse to answer such written interrogatories as your petitioner might be able to frame; that many of the witnesses hereinafter named follow the profession of the stage, which leads to a frequent change of residence; that the population of California, like that of all new countries, is of a peculiarly transitory character, and it may well happen that several of the witnesses hereinafter named, and whom your petitioner has the best reason to believe now reside in, or whose attendance can be procured at San Francisco, may not be found there when a commission shall be executed, if the issuing of the same shall be delayed for so

long a time as would necessarily be required to prepare and frame written interrogatories for their examination; your petitioner further shows, that, by the laws of the State of California, as he is informed and believes, provision is made for compelling the attendance of witnesses before any person or persons commissioned by any court of competent jurisdiction of any other State, to take evidence to be used in any suit pending in such court.

[The petition then named seventy-four witnesses, alleged to be material and necessary for him on the reference, all of whom were residents of San Francisco, except seven, who resided in other parts of California; and then concluded as follows:]

Your petitioner further shows that he has hereinbefore set forth the names of the witnesses whom he desires to examine, as fully and accurately as he can, after diligent inquiry, ascertain the same, but that from the number of circumstances involved in the said reference, and of the individual acts to be testified, the remoteness of the scene of their transaction from New York, the infrequency of mail communication with California, the secrecy which necessarily attended many of the occurrences which this defendant expects and believes he shall be able to prove, and the natural reluctance of the witnesses to communicate information growing out of the character of the transactions themselves, and from other circumstances heretofore referred to, it is not possible, as your petitioner believes, to ascertain and enumerate all the witnesses, or to frame interrogatories for their examination, and that any attempt to examine them in the ordinary way on interrogatories would be almost necessarily attended with the result of sending commission after commission to San Francisco to re-examine witnesses already examined, and to examine others, the materiality of whose evidence would be disclosed by the testimony of those already examined, thereby increasing immensely the delay and expense of this reference, and serving to complicate the evidence and embarrass the court in examining and passing on it.

[Here followed the usual oath to merits.]

Wherefore your petitioner prays that a commission may be issued out of and under the seal of this court, directed to —————————, Esquire, of the city of San Francisco, counsellor-at-law, and such other competent and unexceptionable person

or persons, to be nominated for the purpose, authorizing them to take the testimony of the witnesses hereinafter named, whether correctly named or not, and such other witnesses as may be brought before them in this cause, and that the said defendant may be at liberty to examine, and the plaintiff to cross-examine, and the defendant to re-examine such witnesses orally, and the testimony so taken may be returned to this court, and used on the said reference, or at any stage of this action, and that the proceedings in this action may be stayed, and that your petitioner may have such further and other relief in the premises as may be just and proper; and your petitioner will ever pray, &c.

[ *Signature.* ]

[ *Verification.* ]

Affidavits of several persons were submitted, stating that they had heard reports in California unfavorable to the plaintiff's morals and chastity. But neither the petition nor the affidavits specified any act of misconduct whatever on the part of the plaintiff; and, on the contrary, the defendant expressly disclaimed any personal knowledge.

The plaintiff's affidavit, taken on the day of the motion, stated that she first had notice of this motion yesterday. That from April 29, 1849, when he broke up housekeeping, until the trial, in 1851, the defendant allowed her $1500 per annum, but that thenceforth he had made her no allowance, except $100, by order of court, for certain law expenses. That, since November 1851, she had been obliged to labor for her subsistence, and had not been able to acquire sufficient means to support herself and one sister, a single woman, who resides with her, accompanies her always, and is dependent upon her. That professional services in California are very costly; that neither herself nor any person under her control possesses any means to defray the expenses of this controversy; that the defendant's estate amounts to many hundreds of thousands of dollars; and that she believes it to be defendant's object, by this motion, to overwhelm her with expenses which she has no means of defraying. As to her alleged change of position in California, she stated that when about leaving California, in March and April, 1856, she was invited by the lieutenant-governor, a justice of the Supreme Court, and more than sixty members of the Legislature then in

session, to perform at a complimentary benefit at Sacramento city, the capital of that State, and also performed at a like benefit in San Francisco, on the invitation of a very large number of respectable residents of the latter city.

That ever since defendant's application to the Legislature of Pennsylvania for a divorce [1850], he has been unwearied in his efforts to impress the public with the belief that she was unchaste; that he procured depositions to that effect, and presented them to the Pennsylvania Legislature; and that he produced the same witnesses on the trial of the case, but that, as she infers from the results, they were wholly discredited by that Legislature, and by the jury.

That the efforts of defendant to stigmatize her and impeach her character have been very frequent, and in a most public form, for a period now extended to nearly ten years. And that if, among the multitudes who have heard and read his scandalous imputations, there are not some, even of the virtuous and charitable, who confide in their truth, she is most fortunate, though she is not aware that any such person exists.

That, on the trial of the cause, her counsel called the said Edwin Forrest himself to the stand; that he was sworn, and answered a number of questions, but when asked whether he had committed adultery, he declined to answer. And the said Edwin Forrest did not then attempt to verify, by his oath, any one of the numerous charges which, in previous papers, he had made against her under oath, as upon his own knowledge, although he had no opposition to encounter except a cross-examination, or the possible contradiction of disinterested witnesses.

That she cannot deny having spent and given away money to an extent which prudence forbade; and, so far, she is perhaps liable, in a degree, to the charge of extravagance, but she denies that, either in California or elsewhere, she has led a life of intemperance or vice, as, according to his usual habit of assailing her, the defendant has untruly alleged in his petition. And she further says that she never has, either in California or in any other place, committed adultery or fornication, or committed any violation of chastity. She further stated that she had never intended to relinquish her claim for alimony, or expressed such an intention; that she always desired to accelerate the proceedings, but, being absent from the country, and not

having paid her attorney or counsel, she had not felt at liberty to be importunate on that subject.

An affidavit was produced from the plaintiff's attorney, stating that, shortly after the decision of the general term, the defendant had sold nearly all his property in this State; that the defendant's counsel had obtained from him one consent to stay proceedings on the reference, and had recently applied for another stay until next autumn, which was refused. That from this, and many other circumstances, he believed the defendant never had, at any time, the slightest idea that any intention existed, on the part of the plaintiff or her counsel, to relinquish the prosecution of the reference, however he may have hoped that the engagements of her counsel in other occupations might occasion delay therein.

A witness who, on the plaintiff's return from England, in December, 1858, in company with her sister and a gentleman, had accompanied the party from the steamer to the La Farge Hotel (N. Y.), and introduced the gentleman to the clerk of the hotel, testified that soon thereafter he met the defendant in Broadway; that the defendant "expressed surprise that I, being his friend, had met the party at the boat; he censured me in strong terms for doing so; there was a sharp discussion between us on that point; he said he understood that I made myself responsible for the board; he used very strong terms against the plaintiff, stating, in substance, that her reputation was bad, as being an unchaste woman—using, for this purpose, strong and emphatic language."

The plaintiff also produced an affidavit, made in New York, June 9, 1859, by one of the seventy-four persons named in the petition as residing in California. He testified that he never was in California while the plaintiff was there, and consequently had no personal knowledge of her demeanor there; that he was well acquainted with defendant, but never knew the plaintiff until October, 1857, when he met her in London, England. And from all that he has seen, or known, or believed concerning her, he believes her to be a good, worthy, virtuous woman.

Woodruff, J.—The petitioner asks that the plaintiff's proceedings be stayed. That a commission be issued to California to examine upwards of seventy witnesses, who are named, and

such others as the defendant may discover to be material and may desire to examine. That the examination may be conducted orally before the commissioners, the defendant or his counsel attending before the commissioners, and examining the witnesses, with leave to the plaintiff or her counsel to attend and cross-examine.

The facts sought to be proved by the defendant are the extravagance, intemperance, and unchaste conduct of the plaintiff while in California, between the spring of 1852, and the spring of 1856, which it is alleged became so notorious, that she fell so low in the esteem of the community there, that respectable persons would not associate with her.

This action was tried in January, 1852, and a judgment was entered on the 31st of that month, dissolving the marriage between the plaintiff and the defendant, and decreeing that both be freed from the obligations thereof.

On an appeal to the general term, that judgment or decree was, on the ____ day of July, 1856, affirmed.

The reference then ordered was to take proofs, and ascertain what would be a suitable allowance to the plaintiff for her support, having regard to the circumstances of the parties, respectively.

Neither of the parties have moved the matter to a hearing before the referee, until the month of May, now past, on the 25th of which the reference was, on behalf of the plaintiff, noticed for hearing on the 9th of June instant. Whereupon the present application is made by the defendant.

1. The misconduct imputed to the plaintiff occurred, if at all, more than three years ago, and after the parties were divorced by the judgment of this court.

If such misconduct could affect the plaintiff's title to alimony, or modify its amount, it was just as material when the reference was ordered as it is to-day; and it is not claimed by the defendant to have been recently discovered.

Either party might have brought on the reference, and had the suit brought to a termination.

There was no sufficient reason why the defendant, if he desired to prove the facts now alleged, should wait until the reference was actually noticed, before making his motion, especially when it was perfectly well known to him, that if the commission was

sent to California, months must elapse before it could be executed and returned.

The circumstances called for instant diligence on his part to procure the commission so soon after the reference was ordered as the practice of the court would allow. And had he done so, the delay of the plaintiff in bringing on the reference would have aided him in accomplishing the execution and return of the commission.

But such delay does not, I think, excuse the defendant's neglect to apply for a commission. There never has been a moment since the order of reference was entered, at which the defendant knew how long a time would pass before the reference would be proceeded in; and there has, therefore, never been a moment at which it was not his duty instantly to apply, if he desired a commission, which he knew it would take months to execute and return.

True, the plaintiff did not, in fact, move the reference until now, but she was no more bound to move it sooner, than the defendant was. She might perhaps lose by the delay, and he perhaps might gain; but that did not relieve him from the duty to be prepared for the trial whenever she thought proper to bring it on.

The suggestion, that he believed she never would proceed further in the suit, is fully answered by the plaintiff, who never gave him any reason to believe she should relinquish her claim to alimony. On the contrary, the matters which were before the court on the trial, show very clearly that she has always insisted upon her title to a suitable provision, from the time the parties first separated; and if the defendant, upon any mere conjecture of his own, or upon any rumor for which she is not responsible, has deemed it safe to postpone his preparation for the reference, he has no right to complain if his unwarranted suspicion touching the plaintiff's purpose disappoints him.

And on the other hand, the cause of the delay on the plaintiff's part is not only explained, but it is accounted for in a manner which forbids that the defendant should make it the occasion of any complaint, or the basis or ground of asking a favor. Since November, 1851, the plaintiff has been left by the defendant utterly destitute of the means of support. She has had no funds with which to pay her counsel, and has been

compelled to rely upon her own personal exertions for a main-
tenance. It has not been in her power, therefore, to press on
the reference ; and now, that she has at last found it in her
power to bring the cause to a hearing, this new delay is sought
to be interposed ; and even the sum which the defendant ap-
pears to have paid her voluntarily down to November, 1851, he
has since withheld. In this respect she has not been dealt with
so well as it has often been held his duty as a husband, if she
had herself been found the guilty party; for if she were an
adulteress, the court have said she shall not be turned off to a
life of penury and shame. (Darley *a*. Darley, *Wright's Ohio
R.*, 514.)

I cannot regard her delay, therefore, as furnishing any suffi-
cient reason for the neglect of the defendant to seek any testi-
mony which his counsel deemed material, long before this
present application, and after more than three years have
elapsed : an application which necessarily involves very great
further delay and expense, ought not to be granted, if no other
reason forbade it.

2. If the objection already considered were not insuperable,
the present motion ought not to be granted. It seeks to pro-
cure a sort of roving commission, with which the defendant
may go to California (some two thousand miles), and there ex-
amine whomsoever he may find, and upon such questions as his
counsel may there propose, and although the witness may know
no fact material to the reference, yet if perchance they should
on their examination be able to inform the counsel of some
other witnesses who do know some such fact, then that the latter
may be pursued and examined. That is, the defendant may
have leave to examine whom he will—and if he cannot prove
his charges by those first called, he may learn from them who
can or will testify to such charges, and then examine the lat-
ter—in other words, he would use the commission, first, to find
witnesses, and then to examine them.

If the court have the power to issue such a commission, it
must be a very peculiar and strong appeal to its discretion,
founded in urgent necessity, to prevent great injustice, that
should induce it.

It is not claimed that our statute authorizing the issuing of
commissions by courts of law, confers any power on this court

to send such a commission. (2 *Rev. Stats.*, 293 and 294.) Under our similar previous statute (1 *Rev. L.*, 519, § 11), in a very special case, where the plaintiff resided in a foreign country, and the transactions in question occurred in the foreign country, and were within the knowledge of the plaintiff's clerks, whose names he would not disclose, this court went so far as to allow a commission in which the witnesses should be designated by description as the plaintiff's clerks generally, unless the plaintiff would disclose those names, so that they might be inserted in the commission (Shaffer *a.* Wilcox, 1 *Hale R.*, 502); but the witnesses, however, described, were examined on interrogatories.

What particular circumstances induced this court in The Accessory Transit Company *a.* Garrison, in December, 1857, to make the special order which was made, I am not informed; but even there, the names of the witnesses were to be furnished.

Without pausing to discuss the abstract question of inherent or original power of the Court of Chancery to procure testimony in any mode it sees fit, the practice of the court for two hundred years, in England and this country, is a guide which ought not to be lightly disregarded; and it may at least be said, that nothing but a case of urgent necessity, and in which each of the parties will have an equal advantage, should induce us to depart from it.

The practice of the Court of Chancery in England, on the examination of foreign witnesses, appears to have been entirely uniform, and to have been by written interrogatories, and the witnesses appear to have been named without exception, so far as I have been able to discover, either in the order for examination, or in the commission, or where the party has been served with a list of the witnesses, with names and residences, that is all that appears to have, in some cases, been done. (See Bowden *a.* Hodge, 2 *Swans. R.*, 258. *Beames' Orders*, 30, § 68, describes the practice from the year 1600 to 1815, and see note, § 100, that the witnesses were said by Chief Baron Gilbert to be anciently examined " *super int. inclusis*," and not *super int. ministrandis*. See *For. Rom.*, 126; *Practical Register, Ed. of* 1714, 220. 2 *Dan. Ch. Pr.*, 1040, states the same practice, and refers to *Beames' Orders*, 272, 311. See Oldham *a.* Carleton, 4 *Bro. C. C.*, 88, 89. Cajamaul *a.* Verelst, 7 *Bro. Parl. Ca.*, case 17, 192, is in point in more than one of its features.)

Under our statute (2 *Rev. Stats.*, 180–1, §§ 78–83), provision was made for the examination of witnesses in Chancery, and power was given to direct an oral examination. But the section permitting an oral examination (§ 83) applies also to examinations before a vice-chancellor, or before an examiner. The examination of witnesses was made subject to such regulations as the Chancellor might prescribe in respect to commissions (§ 79), and generally the rules of court were to govern the subject. See sections 81, 87, and 88; and section 88 provides expressly that he may make such rules as he shall think proper concerning the use of written interrogatories for the examination of witnesses residing out of this State.

And the rule on this subject adopted by the Chancellor, in obedience to the statute, was explicit. It in terms provides that, "Witnesses examined out of the State, if the parties do not consent to an oral examination, shall be examined on written direct and cross interrogatories, to be allowed," &c., and "annexed to the commission." See Rule 72 of Rules of 1820, and of each revision down to the new Constitution, and also Rule 62 of the Supreme Court in Equity under the Judiciary Act of 1847.

The rules of the Court of Chancery of 1806 and 1808, No. 24 to 26, and see 68 of 1808, continued in force substantially down to the Revised Statutes, show that the already existing practice in England in relation to foreign commissions was here applied to commissions issued to examine witnesses, though residing in this State, and that written interrogatories were necessary.

In England, it seems not to have been necessary for the counsel respectively to exhibit their interrogatories to the other, but the cross-examining counsel was left to his knowledge of the case to guide him in framing his cross-interrogatories (Butler *a.* Buckley, 2 *Swans. R.*, 373)—a practice which must be deemed very unsatisfactory, and rendering further examination after the publication of the depositions very often necessary. Rule 68, of 1808, shows that the practice of serving and settling interrogatories was early adopted in our Court of Chancery.

3. I am not satisfied that the facts sought to be proved by means of the commission, are proper to be given in evidence on the reference.

It was adjudged, on the 30th day of January, 1852, that the

marriage between the plaintiff and defendant be, and the same was, dissolved.

For all the purposes of the present motion and of the reference ordered, the defendant must be deemed the guilty party. It is his wrong that has deprived the plaintiff of the protection of a husband, and the support and comfort which, if she was innocent, he was bound to furnish to her in a home corresponding with the station in life she had occupied before the occurrences which led to the results now before our minds.

He was bound to support her in that station if no divorce was procured. His adultery, and the divorce which followed, did not relieve him from the duty, while it discharged her from her obligation to him.

In a sense, which under the civil law would be recognized with more force even than under our own, the accumulated property was in part her own.

Under these views of her rights in the property of her late husband, and her title to support, it seems to me that the only circumstances which are the subject of inquiry upon the reference heretofore ordered, are exclusively of a pecuniary nature—such as directly affect the amount of pecuniary provision which would have been proper, had the reference proceeded on the day it was ordered; and that that amount is precisely what sum would have been proper had the amount been fixed on the day the judgment of divorce was pronounced, only affected by proof of such change in the pecuniary condition of either of the parties as may properly augment or diminish the amount.

Whatever duty the plaintiff, after her divorce, owed to the community in which she lived to lead a pure and virtuous life, she owed no duty to the defendant other or greater than she owed to any other member of that community.

By her marriage and subsequent divorce, she acquired a right to her suitable allowance, and if it had been fixed in amount and actually awarded, January, 1852 (as it would have been had no error been committed in the conduct of the proceeding), her subsequent misconduct, if she was guilty, would not, I think, have forfeited it, and for the obvious reason that she would not have violated any right of her late husband, however much she outraged the moral sense of the community. Her late husband would not, I think, have any standing in court on an application

to reduce her alimony upon any such ground. The answer to his application would be, if he proved the misconduct he charged : It now only appears that both are guilty of misconduct. And so long as it remains true that she has not herself wrongfully contributed to the guilt of the defendant, and especially if it be open to the conjecture that her destitute or unprotected situation has contributed to her fall, so long such mutual wrong ought not to affect the division of the money of the husband and the appropriation of a suitable share to her maintenance.

If, in a just sense, the innocent wife may be said to have a right, at the moment the decree of divorce is pronounced, to have alimony according to the then pecuniary condition of the husband, his wealth and personal income, with reference, also, to the number of those dependent upon him for support, and the society in which, before the divorce, the parties have been accustomed to move, and that right be so far fixed that security therefor may be required ; then the cases which hold that, where a wife, who is entitled to jointure or the benefit of a settlement, but finds it necessary to invoke the aid of a court of equity to obtain the benefit of the trust or the execution of the agreements, she will not be defeated in that court by proof of her adultery, or that she is then living in adultery, have an analogous and forcible bearing upon the present question. If the Court of Chancery could exercise its discretion in view of such moral considerations as the condition of such a complainant would suggest, it would seem not unreasonable to refuse to enforce a settlement in favor of a woman, who, though still in law a wife, was living in flagrant and profligate disregard of the obligations which formed the inducement to the settlement. The Court might at least say, " We will not exercise our power in your behalf. You may seek and enforce any strictly legal rights in the court of law, but a court of equity will not interfere in behalf of an adulteress."

Not so. The Court of Chancery will interfere at the instance of the wife, and enforce the specific execution of marriage articles, although the wife is living separate from the husband in a state of adultery ; and so, also, to compel performance of articles binding the husband to her maintenance on an agreement to separate, although she be then living in adultery. See, on this subject, Sidney *a.* Sidney, 3 *Peere Williams*, 269 ; Blount *a.*

Winter, *Ib.*, 276; Seagrave *a.* Seagrave, 13 *Ves. R.*, 439. (See a similar ruling *at law*, Raynor *a.* Batley, 8 *Bing. R.*, 256; Lee *a.* Thurlow, 2 *Barn. & Cress. R.*, 547, which, however, add no strength to the proposition, since a court of law has no discretion whether or not to award a recovery on a right established by a legal covenant.)

In a case earlier than Sidney *a.* Sidney, viz., Mildmay *a.* Mildmay (1 *Vern. R.*, 53), after a divorce *a mensa et thoro*, the wife applied to the Court of Chancery to obtain the rents which had been settled upon her, and on its appearing that she was a lewd woman who had eloped from her husband, and the husband yet offering to take her again, the court gave her only partial relief, but did not refuse altogether to interfere on that ground, and the leading case of Sidney *a.* Sidney afterwards determined that her adultery furnished no reason for withholding the relief which the adulterous wife sought.

It is undoubtedly true, that upon proof that a woman, lately complaining that she had been wronged by the infidelity of her husband, and asking, with the urgency of indignant virtue, to be redressed, is now herself leading a life of profligacy and shame, the outraged moral sense of every upright and honorable mind would, in its first impulse, incline to declare her entitled to no aid from the court, in compelling a support which she shows herself ready to abuse. But this would plainly be extreme, for more than one reason. Possibly her unprotected and destitute condition may be itself the cause of her decline from virtue; and if not so, still she is not to be left to degradation as her only resource. Even if she had been an adulteress, and her husband were on that ground divorced, she should not be left to a life of shame, for want of a comfortable support. Whether, under our statute, in the case last stated, she could claim alimony, I need not say; but in England, the husband seeking and obtaining a divorce from his guilty wife, has been required to provide for her comfortable maintenance. (See *McQueen's Pr. House of Lords*, 537–9; *Observations of* BEST, J., in Lee *a.* Thurlow, 4 *Dow & R. R.*, 17. So also ruled in Darley *a.* Darley, in *Wright's Ohio R.*, 514, and see Robison *a.* Goswold, 6 *Mod. R.*, 171.)

This indeed does not show that lewdness after divorce may not be taken into account, but it suggests that no rule can readily be

stated which, by the influence it could be allowed to have, should be measured.

I have not been able to find any cases in which, on an inquiry into the amount to be allowed for alimony, the conduct of the wife, after the marriage is annulled, has been taken into view. The circumstances which are the subject of inquiry, have been of a direct pecuniary nature. The applications for an increase or diminution of alimony, which are permitted after alimony has once been settled, are of that description. (See Foulkes *a.* Foulkes, cited *Payntor on Mar. and Divorce*, 256, *n.* (q.) ; Kirkwell *a.* Kirkwell, *Ib.*, *n.* (p.) ; De Blacquiere *a.* De Blacquiere, 3 *Haggard*, 322 ; Wilson *a.* Wilson, *Ib.*, 329, *note ;* Paff *a.* Paff, 1 *Hop.*, 584 ; Holmes *a.* Holmes, 4 *Barb.*, 295 ; Miller *a.* Miller, 6 *Johns. Ch. R.*, 91.)

It is stated in the Digests (2 *U. S. Dig.*, 514), that in Sloan *a.* Cox (4 *Hayw. R.*, 75), it was held in Tennessee, a husband, who had been divorced from bed and board and decreed to pay alimony to his wife, cannot avoid the payment thereof on account of the subsequent lewdness and adultery of the wife. I have not been able to find Heyward's Reports in any library to which I have access. There is probably an error in the citation of the volume, since I am told there are but three volumes (probably the third is the volume intended) ; whether, therefore, this case proceeds upon any peculiarity of the law of Tennessee, I am not able to say, nor can the case, upon the mere reference to it in the Digest, be taken as of value as authority. On examination of the case itself, it might appear to have no influence on the present question. But it is obvious that if in such a case the lewdness and adultery of the wife should not deprive her of alimony, it ought still less to affect it when the divorce was absolute.

The case of Packford *a.* Packford (1 *Paige R.*, 274), undoubtedly recognizes the idea, that where the conduct of the wife before the divorce was such as in some degree contributed to the husband's fall from virtue, that conduct may be taken into view, and the Chancellor there also mentions her subsequent indiscretions before the decree, as considered by him in fixing the amount. But no case is mentioned to me going any further, and I am not satisfied that the remarks there made by the Chancellor find any warrant. In Burr *a.* Burr, also (10 *Paige R.*,

Forrest *a.* Forrest.

20), the indignities and cruelties suffered by the wife before the divorce, were deemed entitled to consideration in fixing the alimony.

In both of these cases, the conduct in question was prior to the divorce; in the latter case the relation of husband and wife still continued. Both cases seem to regard the allowance of alimony as in a manner punitive, and to be enlarged or diminished as the husband's offence was more or less aggravated, and in some degree liable to be affected by the manner in which the wife had performed the duties of the conjugal relation, while that continued. But neither of the cases warrant, I think, any such after that relation has ceased, and the duties resulting therefrom no longer subsist.

To prevent any misapprehension from what has been said in respect to the conduct of the plaintiff subsequent to the divorce, it is proper to state that the affidavits used by the defendant on this motion, speak of the reputation which the plaintiff had acquired in California.

No one states any instance of unchaste conduct to the personal knowledge of the party making such affidavit.

The plaintiff, on the other hand, denies, in the most full and unqualified terms, that she has been guilty of any unchaste conduct, or that her reputation in California is such as the defendant alleges; but, on the other hand, charges that whatever of unfavorable repute she may have, is due mainly to the persistent efforts of the defendant to destroy her character.

My conclusion is, that the motion must be denied.

II. *July*, 1859.—Appeal from the order entered hereupon,[*] to the General Term.

*John Van Buren* and *Frederick G. Burnham*, for the appellant.

*Charles O'Conor* and *Nelson Chase*, for the respondent.

By THE COURT.[†]—BOSWORTH, Ch. J.—The opinion of the judge who made the order appealed from, assigns three substantial grounds in support of the order.

[*] The order entered, was simply a denial of the motion.

[†] Present, BOSWORTH, Ch. J., WOODRUFF, PIERREPONT, and MONCRIEF, JJ.

1. That the defendant has been guilty of *laches* in not moving for a commission at an earlier day.

2. That a commission, in the form of the one sought, should not be granted, even if the court has the power in extraordinary cases to award it.

3. That the facts sought to be proved by means of the commission, are not proper to be given in evidence on the reference.

The appellant insists, *First.* That he has not been guilty of any delay, which should deprive him of any right or favor, to which, but for such delay, he would be entitled.

*Second.* That he was entitled at all events to the ordinary commission without a stay of proceedings.

*Third.* That he was entitled to a commission to examine witnesses orally.

*Fourth.* That the facts sought to be proved are relevant and material, in determining the question what alimony, or whether any alimony should be allowed.

The alleged facts sought to be proved are (1) illicit intercourse with several persons, not named; (2) intemperance; (3) extravagance; (4) a vicious and debased association and mode of living.

The misconduct charged is alleged to have occured in California, subsequent to the judgment of divorce (which was entered on the 31st day of January, 1852), and prior to the order of reference now pending, and which was entered on the 24th day of July, 1856, on the reversal by the general term, of that part of the judgment or decree relating to the amount of permanent alimony to be allowed. The plaintiff was in California from May, 1853, to April, 1856.

In this connection it may be observed, that the pending reference is not a proceeding in an action at *law.* If not a proceeding in an equity suit, properly so called, it is a proceeding in a suit, of which, prior to the Code, a court of equity alone had jurisdiction (under the laws of this State).

This court, having jurisdiction of the action, is thereby vested with all the powers of the old Court of Chancery, in respect to the subject-matter of the suit; and which it might rightfully exercise to possess itself of the information requisite to decide the suit, or make any interlocutory order, or any order or decree

in it subsequent to a determination of the main points of controversy, according to justice and equity.

I shall, therefore, assume, that this application should be disposed of, precisely as the late Court of Chancery would dispose of a like motion, made under the same peculiar facts and circumstances.

It will hardly excite surprise if no adjudication can be found directly in point, upon the question of the competency of some of the facts sought to be proved, and the effect which should be given to them if established.

The provisions for permanent alimony usually form part of the decree for a divorce; or are embodied in a further order or decree made before a new state of facts has arisen.

Intemperance and extravagance may precede the institution by a married woman of a suit for a divorce, and may have continued up to the time the decree was pronounced.

But illicit sexual intercourse on her part, could not ordinarily precede the institution of a suit prosecuted by her to a successful issue. It would be natural to expect, that the effect of such misconduct upon the question of permanent alimony, would, ordinarily, be determined upon applications (made subsequent to the order by which it had been fixed) to modify or discharge it, in consequence of such misconduct, if it be true that a court of equity could interfere with that matter, for such a cause.

Section 43 [45], 2 *Rev. Stats.*, 145, declares, that in a case like the present, " the court may make a further decree or order against the defendant, compelling him to provide such *suitable* allowance to the complainant, for her support, as the court shall deem *just*, having regard to the *circumstances* of the parties respectively."

By section 58 [60], " the court may require such husband to give reasonable security for such * * allowance," and if he neglect or refuse, the course to be pursued to secure the payment of the allowance to her, is prescribed.

It is urged that under section 43, only the circumstances of the parties respectively, as they exist at the time of pronouncing the decree, are to be considered in determining what will be a suitable and just allowance.

It is not denied, however, that many matters, other than the

pecuniary means of the parties, are "circumstances" which the court must consider.

The fortune of the husband may be such that its income will support both, separately, as they have been accustomed to live, without the necessity of labor on the part of either. In such a case the wife also may have a separate property; the income of which alone will be sufficient to support her as she has been accustomed to live, or she may have no separate income.

In another case, the husband may have no productive property, and yet may be in the receipt from his profession or avocation of a sum sufficient to support both, as they have previously lived, if living together, but insufficient, if living separately.

In one instance, the wife may be a confirmed invalid, and unable to do any thing towards her support; and in another she may be able to support herself, by the same pursuit, or by some pursuit kindred to that in which the defendant has earned his fortune, and which she may be competent, and as a matter of taste and choice be willing to prosecute.

Would a provision, which in the latter case would be just and suitable, be just and suitable in the former? Should an allowance of the same precise amount be made in each of the two cases last supposed? If not, then the pecuniary faculties of the parties are not alone to be regarded, unless the definition of the term is made so comprehensive as to include a capacity to earn the means of support in whole or in part. If it be made to include that, then in some of the cases supposed, the injured wife might, with her view of the fitness of things, deem it a personal degradation to perform upon the stage, or in a public concert. As a matter of religious conviction, it might be, that she could not be induced to attend the former even as a spectator. Another woman might find her chief happiness in the applause which her performances would elicit.

An allowance made to the one upon the basis, that she might, and therefore should contribute to her support by appearing as an actress or public performer, would involve her in misery; while made on the same basis to the one who had no such scruples, would provide her with all that she would desire.

Is any regard to be paid to the religious convictions of the one, or to the effect which a resort to such pursuits would work

in her social relations and position, or to the reputation which such associations might create among those whose good opinion she would most value, viz., the religious and more cultivated and moral portion of the community?

Without undertaking to say which class is right, or which wrong, or that either is exactly right; we all know that a large class of the community, and a class too, that is regarded as the more moral, because the most consistent, in conforming their conduct to the religious doctrines which they profess and cherish, regard theatres as schools of vice, and feel and act upon the conviction that it is sinful to witness their exhibitions.

Another class regard them with favor; and the entertainments they furnish as worthy of patronage. In this class are included many who hold high positions in the circles denominated and considered, by the bulk of the community, as the first circles or classes of cultivated society.

Many would regard all expenditures made to secure the pleasures incident upon attending theatrical performances, whether paid as the price of admission, or to dress in a style deemed suitable to the occasion, as inexcusable extravagance; and constant attendants upon the theatre, as persons to whom "a vicious and debased association and mode of living" might be justly imputed.

This consideration alone, shows how difficult it is to state any rule by which it can be accurately determined, in a manner that will operate justly upon all parties to such actions, what is, and what is not extravagance; and what is a vicious and debased association in such sense, that by reason of a complainant being guilty of it, a diminished amount of alimony should be allowed to her.

Some kinds of conduct, and some kinds of association may be treated as being, in the common judgment of civilized society, so gross and vicious as to be absolutely degrading.

But there is also an endless variety of conduct, and of association inseparable from it, in respect to the morality and debasing tendency of which, persons of intelligence, of a fair general morality, and of good purposes, differ.

And the same considerations are equally applicable to various sources of enjoyment and the kind of life and association which they, to some extent, induce, and to the consequent charges of

extravagance or debasing association which might, in the judgment of many, be predicated of them.

Is each one, whose duty it may be to sit in judgment in a case like this, to determine what is extravagant, or what association is debasing, by his own habits and personal opinions, and be influenced by them in settling questions like those now presented; or is there some general principle by which such questions must be determined, without considering the great variety of views and opinions which it would be necessary to do, if all, or any of the facts now sought to be proved, were proper subjects of evidence.

The rank and position which the parties occupy in society, and their general mode of life, should be considered; and the allowance made, as a general rule, should at all events be sufficient to enable the wife to continue in the enjoyments to which she has been accustomed, when the husband's income is adequate to support both as they have been accustomed to live.

Whether that allowance be expended in part indiscreetly or not, does not concern the husband. To a just and suitable allowance she is entitled. As a general rule, the particular application of it is a matter entirely for her own determination. Whether she shall so change her habits as to economize and accumulate, or whether she will expend a part, and if so, what part, upon objects which she regards as charitable or deserving of encouragement, or in a manner which some may deem useless or extravagant, are subjects in respect to which the husband, the party in fault, has no right to be heard.

It is his duty to provide the means for her support and maintenance to the amount determined to be suitable and just; her manner of expending it he has no right to dictate.

Whether in some of the extreme cases supposed, on the argument, such as the idiocy or lunacy of the wife, any greater sum should be allowed than would be requisite to defray fully the expenses of maintaining her, it is not important to consider: in such cases she would be destitute of the capacity to appropriate any sum which might be allowed, and it would not be inconsistent with any conclusion yet stated to limit the allowance to a sum which would cover her actual expenses, as it might be deemed suitable to provide for her.

Forrest *a.* Forrest.

But this case presents no such question, and therefore does not require any minute consideration of it.

The allegations of the petition, on which the commission was moved for, are: "that during the two years or so that she resided in San Francisco, she gradually fell from the favorable position first accorded to her, and acquired the reputation of being a woman of bad morals, and dissolute and extravagant life, addicted to the excessive use of ardent spirits, and also unchaste; not with reference to one person alone, but to several."

That the petitioner "has derived information of acts of intemperance, immorality, fornication, and adultery, on the part of said plaintiff, during the period referred to, from statements made by *witnesses thereof*, in some instances, and from careful inquiry as to facts which were within the knowledge of other witnesses, and could, and would be testified to, if the testimony was required or compelled."

The plaintiff, in an opposing affidavit, declares and testifies, "that she never has, either in California or in any other place, committed adultery, or fornication, or committed any violation of chastity."

She "says she cannot deny having spent and given away money to an extent which prudence forbade; and so far she is, perhaps, liable in a degree to the charge of extravagance; but she denies that, either in California or elsewhere, she has led a life of intemperance or vice, as, according to his usual habit of assailing this deponent, the said defendant hath untruly alleged in his petition."

If it be true, as the defendant's petition seems to state, that persons, who have been "witnesses" of acts of fornication and adultery on the part of the plaintiff, have so told him; then, assuming these acts to be material, he needs only their testimony, if they are entitled to credit, and if they are not entitled to credit, proceedings should not be delayed to examine them.

If the phrase "witnesses thereof" was intended to be applied only to "acts of intemperance and immorality," or to one of them, then it may be said that the charge is very indefinite, and the acts claimed to be acts of intemperance or immorality, are not defined.

If the immorality meant, be other than "the excessive use of

ardent spirits" or " fornication," there is nothing in the petition to indicate very clearly of what it is supposed to consist.

If acts of fornication subsequent to the decree are inadmissible in evidence, upon the question of the alimony to be allowed, then I think it may be assumed that subsequent acts of intemperance are.

The true solution of this question must depend upon the rules and principles on which alimony is awarded, and its amount determined, to be ascertained from the series of decisions made in such cases, and the statutes upon the subject, and not upon any arbitrary and fluctuating notion of what may be seemly and proper, or desirable, in a case of such facts as are alleged to exist in this particular case.

It must be obvious that the decisions in the ecclesiastical courts of England do not fully meet the precise case, for the reason that they leave the marriage relation subsisting, and the husband under a legal obligation to provide the wife with at least the necessaries of life, and she is not wholly freed from obligations to him. He has still an interest in her, and may justly be deemed to be afflicted by her misconduct.

In those courts, although a separation be decreed for the adultery of the wife, an allowance is provided for her, and the considerations which, in such a case, might justly moderate its amount, can have no just application to the case of a woman absolutely divorced for the misconduct of her husband, or upon the question whether the amount of alimony (having been rightfully determined at the time the decree of divorce was pronounced) can be reduced for her subsequent misconduct. The decisions in those courts, from the necessity of the case, have not been made upon any such state of facts, and consequently have not established any rule which precisely meets them.

By the rules of the common law, upon the marriage, the husband is vested with all the present available means of the wife, together with a right to her future earnings and acquisitions. At the same time the law casts upon him the duty suitably to maintain his wife, according to his ability and condition.

When a marriage has been duly solemnized, each of the married parties acquires thereby certain legal rights, as against the other, not to be forfeited, unless for some breach of matrimonial duty. " When an erring one has broken the matrimonial en-

gagement, the law gives to the innocent party such redress as the nature of the case and the constitution of the tribunal allows." If a " husband has committed adultery, the court can neither watch him during his after-life, to prevent his repeating the offence, nor wipe out from his nature the stain which the sin has imparted, nor take off the weight of sorrow from the mind of the wife; but if she chooses not to overlook the transgression, it can compel him to" provide " for her what the marriage gave her a right to demand, a pecuniary support." (*Bishop on Mar. and Div.*, ed. 1859, § 560, 560 *c.*)

What she may do after she has been divorced, and the marriage relation has been dissolved by reason of his adultery, can affect no matrimonial engagement, for none exists, nor violate any matrimonial duty, for she no longer owes any to her former husband.

What he should be made to pay, as the means of her future support, according to all general rules of judgment, must depend upon the facts which create the right to it; and they must be the facts existing and as they exist when the right becomes fixed and perfect. The time of pronouncing the decree is the one at which the right is judicially ascertained and declared.

From that moment the marriage relation, and all duties consequent upon it, are ended, except the duty of the husband to make such a provision for the support of the wife as the marriage made it his duty to furnish and gave her the right to demand, having regard to the circumstances of the parties respectively.

Our own statutes on this subject seem to have been framed with this view, as being the true one in relation to her rights.

By the statutes of this State, if a wife obtain a divorce by reason of the adultery of her husband, and if at the time the decree is pronounced, she " be the owner of any real estate, or have in her possession any goods, or things in action, which were left with her by her husband, acquired by her own industry, given to her by devise or otherwise, or to which she may be entitled by the decease of any relative intestate, all such real estate, goods, or things in action, shall be her sole absolute property." (2 *Rev. Stats.*, §§ 146, 44 [46]; *Ib.*, 190, § 6.)

So too, if the wife be the guilty party, and a divorce be granted for that cause, she not only forfeits all right to dower in

her husband's real estate, or any part thereof, and to any dis-
tributive share in his personal estate (*Ib.*, 46 [48]) ; but the
husband's right " to any real estate owned by the defendant, at
the time of pronouncing the decree, in her own right, and to the
rents and profits thereof, shall not be taken away or impaired
by such dissolution of the marriage ; and he shall also be en-
titled to such personal estate, and things in action, as may belong
to the defendant, or be in her possession at the time such decree
shall be pronounced, in like manner as though the marriage had
continued." (*Ib.*, § 45 [47] ; 2 *Rev. L.*, §§ 7, 8.)

Sections 44 and 45, according to their terms, operate upon the
property and rights of which they treat, and which they settle,
as of the time of pronouncing the decree of divorce. But they
deprive the guilty of all rights of property acquired by the mar-
riage ; and if the wife be the guilty party they do not restore,
but, on the contrary, prohibit the court from restoring to her for
her support and maintenance any property which she owned at
the time of the marriage, or acquired during coverture. Neither
section 43, nor any other section of our statutes, in terms, author-
izes the court to award any allowance for her support and main-
tenance, when a divorce has been granted by reason of her
adultery.

If, therefore, the New York Court of Chancery had no power
to award permanent alimony, except in the cases specified in
the statute, it may be that it could grant none in such a case as
Darley *a.* Darley (*Wright's Ohio Rep.*, 514), nor to any woman
whom it might divorce by reason of her adultery. But on this
point it is not necessary to express any definite opinion.

For whether or not the courts must look to the statutes alone
for their power to grant permanent alimony, and find in them
the source and limits of their authority, the argument is quite
strong that the rights of the parties are to be settled and fixed,
upon the facts as they exist at the time the decree of divorce is
pronounced.

The rights declared by sections 44 and 45 cannot, I think, be
modified or affected by the subsequent licentiousness (however
gross) of the party to whom they are thus confirmed.

And although a woman who, in a suit brought against her
by her husband for a divorce, if convicted of adultery, forfeits
her right to dower, or to any distributive share in his personal

estate (2 *Rev. Stats.*, 146, § 48; 1 *Ib.*, 741, § 8), and "every join-ture, devise, and pecuniary provision in lieu of dower (1 *Rev. Stats.*, 742, § 15); yet although she may, undiscovered by him, have committed adultery in his lifetime, she probably, in the event of his dying intestate, would forfeit neither.

Yet in morals her offence is as grave, and should be attended with as serious consequences to her, though first discovered after his death, as if discovered and she had been convicted of it in his lifetime, in a suit brought by him to obtain a divorce for that cause.

If section 43 can properly be construed as requiring a regard to be had only to the circumstances of the parties respectively, at the time the decree is pronounced, in fixing the amount of an allowance, which will be suitable and just; and if partly for that reason the authority confined by section 58 [§ 60] was granted, then these two sections are not only harmonious (al-though the allowance may be modified in the event of a subse-quent change in the pecuniary condition of the parties), and the latter section will enable any order or decree made under the former to be enforced, but, in connection with the other sections cited, they furnish some warrant for holding that it was intended to be final, in such sense as not to be liable to be withheld by reason of the subsequent immoral conduct of the party whose support it was designed and made to secure.

No case has been cited in which it was moved to have an allowance fixed at the time of the decree reduced for subsequent misconduct, or in which such a matter was treated as relevant or material for such a purpose, on an application to modify the allowance fixed by the decree.

Applications to change the rate of allowance, when once fixed, are not numerous, and *Mr. Bishop,* in his elaborate and instructive treatise on Marriage and Divorce, quotes the remark of Dr. Lushington, to the effect that he remembers but two in-stances were applications to increase or diminish it have been successful (*Bishop on Mar. and Div.*, § 593, 3d ed.), without inti-mating that his own researches had resulted in finding others.

Considering the length of time that this branch of the law furnishes evidence, through the reports and otherwise, of the mode in which it had been administered in this and other States of the Union; the fact that such subsequent misconduct does

not appear to have been presented as an element to affect the amount of the allowance, may be regarded as a strong and almost conclusive presumption against its admissibility.

I regard § 43 [45], 2 *Rev. Stats.*, 145, not as permissive merely, but as imperative; and that it is the right of the wife to demand, and the duty of the court to decree a suitable allowance. (1 *Laws of N. Y., K. & R.*, 93, § 2; 1 *Greenleaf, do.*, 428, § 2; and 2 *Rev. L.*, 199, § 5.)

Mr. Bishop, in the work already cited, reaches the conclusion, fully justified, as I think, by the authorities to which he refers, and the practice of the court, that " the doctrine extends through the entire field of our law, as administered alike in the common law, equity, and ecclesiastical tribunals; that, in effect, whenever the wife is adjudged entitled to live separate from her husband, by reason of his breaches of matrimonial duty, a concurring adjudication must be pronounced, that he support her while so living (*Ib.*, § 561), during their joint lives." (*Ib.*, § 592.)

" The law seems to recognize the right of the wife to use one-third or more of the common estate, in its rules concerning dower, and the distribution of the effects of a deceased husband. And in reason, the wife living separate from her husband, should be permitted to spend one-third as much for her living as he for his." (*Ib.,* § 619; see also §§ 617–623, *d.*)

" When a breach of matrimonial duty has been committed, sufficient in extent and kind to authorize the injured party to separate from the offender—evidently on reasons already given" (*Ib.*, §§ 560 *b.*, 560 *c.*)—" the offender should pay to the other as much as will place the other in a pecuniary condition equal to what would be enjoyed if the breach had not taken place. * * * Now we have, first, the damages suffered; secondly, a proceeding established by law, wherein the judge has a discretion to award money, and no specific rule, either of statute or common law, established to limit the discretion below a consideration of the damages." (*Ib.*, § 619, *a.*)

He forcibly concludes, that " there are some plain propositions of common-sense governing this matter of alimony, on a divorce from the bond of matrimony, as follows : *First,* The innocent party should not be left to suffer pecuniarily for having been compelled by the conduct of the other to seek the divorce. *Secondly,* The wife made thus in a certain sense a widow,

should not usually be set back simply where she stood, in point of property, when she entered the marriage. * * * *Thirdly,* She should not stand worse than if death instead of divorce had dissolved the connection."

In Richardson *a.* Wilson (8 *Yergh. R.*, 67), the court intended that the right of the wife to a support from her husband, was a constitutional right, which the legislature could not take away by a divorce bill, passed *ex parte,* and without notice to her, even supposing it to be effectual, as against her, to dissolve the marriage itself. In Lawrence *a.* Lawrence, Chancellor Walworth remarks, that "if she succeeds in establishing such improper conduct on the part of the husband to entitle her to a divorce or separation, she is entitled to a portion of the property as a *right,* founded upon his violation of the marriage contract."

The legislation of such of the States (also cited and commented on by *Bishop*) as provides, in case of a divorce, for a division of the property, seems to be founded upon the rule, as one that is elementary and fundamental, that a woman who obtains a divorce for the adultery of her husband, has a right to a portion of his property, or to the use of it for her support and maintenance; and that what is suitable and just, so far as that question may be affected by the conduct of the wife, must be determined by her conduct prior to the decree, and that with such determination, all power to inquire into it, as affecting the question of such alimony, is at an end. (*Bishop,* §§ 623 *c.,* 630.)

In some States the courts, by statute, have a discretion, when they deem it wise, to make her an allowance, although the divorce is granted because she is the guilty party. There are several reported cases in which an allowance has been made to her under such circumstances. (*Bishop's Div.,* 561, and the cases cited in notes 1, 2, 3.)

My conclusion is, that when a woman is divorced from her husband by reason of his adultery, her right to such suitable allowance as may be just, having regard to the circumstances of the parties, respectively, as they exist at the time the decree is pronounced, is perfect and absolute.

That it is no part of the province of the court that fixes the amount, to watch over her subsequent conduct in life, or to take proof of it, as a ground of affecting the right to an allowance, or its amount.

That her subsequent misconduct no more impairs her right to it, than such subsequent misconduct would impair her right to dower, or to a distributive share of her husband's personal estate, if he had died intestate, and no divorce had been pronounced.

That whatever may be the power of the court, under particular statutes, or in the absence of any statute affecting the question, to enlarge or diminish the amount, subsequently, by reason of an improvement or loss of the faculties (the property) of either or of both of them, the allowance is to be fixed in view of all the circumstances proper to be considered, as they exist at the time the decree is pronounced.

How she spends it, no more concerns the former husband or the court, than the manner in which any other woman may spend the like sum. Whatever feeling he may be supposed to have in the matter in judgment of law, he stands in the same position to her as to any other unmarried woman in society.

Her subsequent good or ill conduct, can be made to affect her only as the same conduct would affect other individuals. There is no law by which her misconduct, whatever it may be, can be punished by a forfeiture of part of an allowance, just in itself, when fixed and adjudged to her by reason of her husband's violation of his legal duties to her, nor by which her subsequent meritorious conduct can be rewarded by an increased allowance at his expense.

I think, therefore, that the order appealed from was properly granted, on the ground that the facts sought to be proved are inadmissible in evidence on the pending reference.

Whether the pending motion should have been denied for the other reasons assigned by the judge who made the order appealed from, it does not become very important to consider further, if the conclusion last expressed be correct.

The opinion delivered in support of the order in question, proves quite conclusively that the defendant is not entitled, as a matter of strict right, to the commission, which by statute may be issued " to take testimony in any cause depending in the Court of Chancery" (2 *Rev. Stats.*, 180, § 84 [78]), or "in a court of law, being a court of record," in an action in which " an issue of fact shall have been joined" (*Ib.*, 393, § 19 [§ 11]); or in which " an interlocutory judgment shall have been ob-

tained" (*Ib.*, 396, § 32 [§ 24]); even though some of the matters offered to be proved were relevant and material.

The allegations of extravagance as immaterial, and of intemperance as too vague and indefinite, are no justification to the court for subjecting the plaintiff to any delay in the proceedings upon the reference.

The previous history of the action entitles the plaintiff to some consideration in respect to her alleged fornication and vicious mode of living while in California, even though proof of them might be material. The pleadings, verdict, bill of exceptions, and the judgments of the special and general terms of this court (upon which in part the order appealed from was made), show that she was charged by the defendant's answer in this cause with acts of adultery with various persons who were named, as well as with persons to the defendant unknown; and that after a trial, almost without a parallel as to its length, a jury determined that each and all of those charges were untrue.

The alleged acts of fornication now sought to be proved, were committed, if at all, in California, between May, 1853, and April, 1856. More than three years had elapsed after the plaintiff left California, before the motion was made which resulted in the order appealed from.

The plaintiff denies, in the most unqualified manner, that she has been guilty of any misconduct of the character in question.

The defendant does not, in his petition, name any person with whom (as he has been informed) the plaintiff has committed fornication, nor any person as one who will testify to any specified facts which, if uncontradicted, would tend to show that she had been guilty of such misconduct.

He states, it is true, "that he has derived information of acts of intemperance, immorality, fornication, and adultery on the part of said plaintiff during the period referred to, from statements made by witnesses thereof in some instances, and from careful inquiry as to facts which were within the knowledge of other witnesses, and could and would be testified to, if the testimony was required or compelled."

He also states, in respect to the seventy-five witnesses named in his petition, that they "are, and each of them is, as your petitioner is advised by his counsel hereinafter named, and believes, a material and necessary witness for the defendant in the further

defence of this action, and on the hearing before the said referee; that your petitioner has stated to John Van Buren, Esq., his counsel herein, who resides in the city of New York, the *facts* which he expects to *prove by each* of said witnesses, and that he is advised by his said counsel, and believes, that each and every of said witnesses is material as aforesaid;" " that among the witnesses hereinafter named" (in the petition), " are several whom your petitioner is informed, and believes, have had criminal intercourse with the said plaintiff."

But the petition does not designate any of them as the persons with whom such misconduct has been committed, nor detail any of the facts which were stated to defendant's counsel, as the facts which he expected to prove by either of the witnesses.

Allegations of conduct of such character as is here imputed to the plaintiff, if the defendant possesses any information in respect to it entitled to any consideration, can be made more specific, and be established by witnesses who can be named in a commission.

If they cannot be, the court ought not, after the experience furnished by the trial of this cause, to issue a roving commission to examine as witnesses whomsoever the defendant may desire, and whose character the plaintiff may not be able to prove, although not worthy of the slightest credit in court or out of it, in order to prove such misconduct with persons who are not named, and at times not intimated.

As nothing but a case of urgent necessity should induce the court to grant a commission under the circumstances of a case like this, and in a condition such as this is, some stronger grounds for believing that the facts alleged are true should be shown than have been established in support of the defendant's petition.

It is for the reason that no such case of urgent necessity has been presented, and because allegations much more precise and specific, based on transactions alleged to have occurred in the city where both parties at the time resided, have been fully tried and found to be destitute of truth, and because of the long delay in moving for the commission, that the order appealed from should, among other reasons, be affirmed.

To justify the issuing of a commission in such a case as the present, at the time and under such circumstances as the one in question was applied for, and the subjecting of the plaintiff to any delay or expense in its execution, a case should be presented

free from all suspicion that any part of the motive in asking it is to delay or annoy the plaintiff, and furnishing strong moral evidence that the facts alleged can be proved, and that great injustice would be done to the defendant if the court withheld the aid necessary to procure the proper evidence.

The petition and other papers on which the order appealed from was made, do not, in my opinion, present such a case, and for that reason, also, the order should be affirmed.

All the other Justices concurred, except PIERREPONT, J., who dissented from that part of the opinion which holds, that in fixing the amount of alimony, the immoralities and bad conduct of the wife, after the decree of divorce is pronounced and before the amount of permanent alimony is finally fixed, cannot be considered by the court.

Order affirmed.

---

## THWING a. THWING.

*Supreme Court, First District; Special Term, October, 1859.*

### NEW PARTIES.—JUDICIAL SALE.

In an action of partition, after judgment of partition and sale, and the advertisement of sale had been commenced, the plaintiff died, and such of his heirs as were not already parties defe�گ lant were substituted in his place as plaintiffs.

*Held*, that it was not neceṣsary to advertise anew, changing the title of the cause.

Where a party is made plaintiff under section 121 of the Code, as the successor in interest of the original plaintiff, he is bound by all the acts of the plaintiff, and is not entitled, as a party brought in as defendant is, to open former proceedings.

Motion to compel purchaser to complete his purchase.

This was an action for partition. The objection made by the purchaser is stated in the opinion.

INGRAHAM, J.—Pending the advertisement of sale, the plaintiff in this action died, and his share of the premises sought to